1

2

3

4

5

6

7   **UNITED STATES DISTRICT COURT**

8   **EASTERN DISTRICT OF CALIFORNIA**

9

10

| | |
|---|---|
| ALBERT ANDREW LUCERO, | Case No. 1:10-cv-01714-AWI-SKO-HC |
| Petitioner, | ORDER SUBSTITUTING WARDEN KIM HOLLAND AS RESPONDENT |
| v. | FINDINGS AND RECOMMENDATIONS TO DISMISS PETITIONER'S STATE LAW CLAIMS, DENY THE FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS (DOC. 19), DENY PETITIONER'S REQUEST FOR AN EVIDENTIARY HEARING, DIRECT THE ENTRY OF JUDGMENT FOR RESPONDENT, AND DECLINE TO ISSUE A CERTIFICATE OF APPEALABILITY |
| KIM HOLLAND, Warden, | |
| Respondent. | |
| | **OBJECTIONS DEADLINE:** **THIRTY (30) DAYS** |

Petitioner is a state prisoner proceeding pro se and in forma pauperis with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The matter has been referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rules 302 through 304. Pending before the Court is the first amended petition, which was filed on September 29, 2011.  Respondent filed an answer on March 7, 2012, and Petitioner filed a traverse on June 15, 2012.

I.   Jurisdiction

Because the petition was filed after April 24, 1996, the

1

effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the AEDPA applies in this proceeding.  Lindh v. Murphy, 521 U.S. 320, 327 (1997); Furman v. Wood, 190 F.3d 1002, 1004 (9th Cir. 1999).

The challenged judgment was rendered by the Superior Court of the State of California, County of Stanislaus (SCSC), located within the jurisdiction of this Court.  28 U.S.C. §§ 84(b), 2254(a), 2241(a), (d).  Further, Petitioner claims that in the course of the proceedings resulting in his conviction, he suffered violations of his constitutional rights.  The Court concludes it has subject matter jurisdiction over the action pursuant to 28 U.S.C. §§ 2254(a) and 2241(c)(3), which authorize a district court to entertain a petition for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court only on the ground that the custody is in violation of the Constitution, laws, or treaties of the United States.  Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000); Wilson v. Corcoran, 562 U.S. - , -, 131 S.Ct. 13, 16 (2010) (per curiam).

An answer was filed on behalf of Respondent Mike McDonald, who, pursuant to the judgment, had custody of Petitioner at the High Desert State Prison, his institution of confinement when the initial petition and FAP were filed.  (Docs. 19, 37.)  Petitioner thus named as a respondent a person who had custody of Petitioner within the meaning of 28 U.S.C. § 2242 and Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts (Habeas Rules).  See, Stanley v. California Supreme Court, 21 F.3d 359, 360 (9th Cir. 1994).  The fact that Petitioner was transferred to the California Correctional Institution at Tehachapi (CCIT) after the FAP was filed does not affect this Court's jurisdiction.

2

Jurisdiction attaches on the initial filing for habeas corpus

relief, and it is not destroyed by a transfer of the petitioner and

the accompanying custodial change.  Francis v. Rison, 894 F.2d 353,

354 (9th Cir. 1990) (citing Smith v. Campbell, 450 F.2d 829, 834

(9th Cir. 1971)).

Accordingly, the Court has jurisdiction over the person of the

Respondent.  In view of the fact that the warden at CCIT is Kim

Holland, it is ORDERED that Kim Holland, Warden of the California

Correctional Institution at Tehachapi, be SUBSTITUTED as Respondent

pursuant to Fed. R. Civ. P. 25.[1]

II.  Procedural and Factual Summary

In a habeas proceeding brought by a person in custody pursuant

to a judgment of a state court, a determination of a factual issue

made by a state court shall be presumed to be correct; the

petitioner has the burden of producing clear and convincing evidence

to rebut the presumption of correctness.  28 U.S.C. § 2254(e)(1);

Sanders v. Lamarque, 357 F.3d 943, 947-48 (9th Cir. 2004).  This

presumption applies to a statement of facts drawn from a state

---

[1]     Fed. R. Civ. P. 25(d) provides that when a public officer who is a party to a civil action in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending, the officer's successor is automatically substituted as a party. It further provides that the Court may order substitution at any time, but the absence of such an order does not affect the substitution. The Court takes judicial notice of the identity of the warden at CCIT as recorded on the official website of the California Department of Corrections and Rehabilitation (CDCR).  The Court may take judicial notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned, including undisputed information posted on official websites.  Fed. R. Evid. 201(b); United States v. Bernal-Obeso, 989 F.2d 331, 333 (9th Cir. 1993); Daniels-Hall v. National Education Association, 629 F.3d 992, 999 (9th Cir. 2010).  The address of the official website for the CDCR is http://www.cdcr.ca.gov.

appellate court's decision.  <u>Moses v. Payne</u>, 555 F.3d 742, 746 n.1 (9th Cir. 2009).  The following statement of facts is taken from the opinion of the Court of Appeal of the State of California, Fifth Appellate District (CCA) in case number F054541, filed on June 24, 2009.

PROCEDURAL HISTORY

Armando Lopez (A.Lopez), Paul Anthony Lopez, Jr. (P. Lopez), and Albert Andrew Lucero (Lucero) were charged with the premeditated attempted murder (count 1) of Kenneth Lindsay, assault with a deadly weapon (count 2), possession of a shank while in jail or prison (count 3), and participation in a criminal street gang (count 4). The information also alleged that the three committed the offenses charged in counts 1, 2, and 3 for the benefit of a criminal street gang within the meaning of Penal Code FN1 section 186.22, subdivision (b)(1), and that the three personally inflicted great bodily injury (§ 12022.7, subd. (a)) and personally used a deadly weapon (§ 12022, subd. (b)) in the commission of the offenses charged. The information also alleged that A. Lopez had served a prior prison term and that Lucero had suffered two prior serious felony convictions and had served a prior prison term. The prosecutor ultimately decided not to seek the personal-use enhancement against P. Lopez and Lucero. A fourth man, Timothy McKenzie, was charged, but was acquitted by the jury.

FN1. All further references are to the Penal Code unless noted otherwise.

Following trial, the jury found all three defendants guilty on counts 1, 3, and 4, but acquitted them of assault with a deadly weapon. The jury found true the allegation that the offenses were committed for the benefit of a criminal street gang and that the three defendants had each personally inflicted great bodily injury. The jury also found that A. Lopez had personally used a weapon (the shank). In a bifurcated proceeding, the trial court found true the allegations concerning the prior prison terms and prior serious felony convictions.

Lucero was sentenced to an indeterminate term of 30 years to life on count 1 and a consecutive determinate term of

4

eight years on the remaining counts. P. Lopez was
sentenced to an indeterminate term of 15 years to life on
count 1 and a consecutive determinate term of two years on
the remaining counts. A. Lopez was sentenced to an
indeterminate term of 15 years to life on count 1 and a
determinate term of two years on the remaining counts.

FACTUAL SUMMARY

All three defendants were inmates at Stanislaus County
Jail and all were validated members of the Norteño gang.
Lindsay, McKenzie, and the three defendants were housed
together with other documented members of the Norteño gang
FN2 in a 12-man cell. On October 19, 2006, the inmates
were removed from their cell for cell maintenance. Four of
the inmates, including Lindsay, temporarily were placed
together in a holding cell. While in the cell, Lindsay
found three balloons of heroin. Lindsay gave one balloon
to a cellmate and secreted two of the balloons on his
person. Later, Lindsay informed A. Lopez and P. Lopez
about the heroin. Heroin is a valuable commodity in jail.
Generally, gang members are required to share with other
gang members any drugs that are found, not for
consumption, but for use in gaining power and control
within the jail. Lindsay kept his two balloons instead of
passing them on to gang leaders. He began to barter the
heroin for commodity items, which violates the gang's code
of conduct. Inmates who engage in this behavior face
punishment and "removal" by other gang members. Fatal
removals involve the use of weapons.

> FN2. The defendants are referred to in the
> record both by their names and by their gang
> monikers. P. Lopez is sometimes referred to as
> "Mugsy." A. Lopez is sometimes referred to as
> "Soldier," and Lucero is sometimes referred to
> as "Lil Man" or "Manos." McKenzie's moniker is
> "Scorpizi" or "Scorpion" and Lindsay's moniker
> is "Psycho" or "Psychs."

Later that evening, after Lindsay took his shower, he was
invited to join in a game of cards. Seated at the table
were the three defendants and McKenzie. While sitting at
the table, Lindsay was hit from behind in the chest. He
turned and saw A. Lopez. P. Lopez came to Lindsay's side.
At first, Lindsay believed P. Lopez was coming to his aid,
but instead P. Lopez punched Lindsay in the face and was
grinning. Lindsay was hit from the other side but was not

5

sure who hit him. He tried to grab hold of McKenzie but was unable to stay up. Lindsay fell to the floor. His assailants then kicked and hit him numerous times. Lindsay yelled "man down" in an attempt to summon deputies. P. Lopez told him to "shut up" and "close [his] eyes," a reference Lindsay understood as meaning to die. Lucero kicked him from behind. Lindsay could not say how many times he was kicked or hit or who inflicted what blows. He did not see McKenzie hit or kick him. Lindsay did not see any weapons. After A. Lopez hit him in the chest, Lindsay pushed A. Lopez off of him and A. Lopez scooted to the right and was gone.

Lindsay lost consciousness. As a result of the attack, Lindsay suffered wounds to the back of his head requiring stitches; a number of scratches, including one across his neck; a slice and scrape across his nipple; and a small puncture-like wound on his chest that did not require stitches. There was no mention of the puncture wound or stabbing in the medical reports.

When the deputies arrived at the cell, Lindsay was down and nonresponsive. There was blood on the floor and blood scattered about the cell. None of the inmates in the cell claimed to have seen what happened. The deputies segregated the inmates who had visible signs of trauma. P. Lopez, A. Lopez, and one other inmate were found to have redness, swelling, or cuts on their hands. A. Lopez was wearing a T-shirt that had a sleeve torn off, and blood was found on his boxer shorts. P. Lopez's boxers also had blood on them. There were no marks found on Lucero's hands. After the assault, the heroin was gone.

The next morning, Deputy Teso, a gang specialist officer, came to investigate the attack. When interviewing an inmate, Teso asked him to lift his trouser legs. When the inmate complied, Teso found a "huila" or written memo. The huila was addressed to "Manos" and signed by "Soldier." It detailed the assault on Lindsay and named those who participated in the attack and provided the motive for the attack—Lindsay's failure to follow the gang's code of conduct.

Detective Navarro interviewed Lindsay the day after the assault. Lindsay did not identify any of his attackers. Later, Lindsay said he did not do so out of fear. In March 2007, Lindsay ran into A. Lopez during a court date. A.

> Lopez asked Lindsay if he was going to testify and told
> Lindsay he was lucky to be alive. Lindsay took this as a
> threat. After this encounter, Lindsay negotiated a deal
> with the prosecution and identified his attackers.

People v. Lopez, no. F054541, 2009 WL 1783504 at *1-*2 (June 24, 2009).

### III.   Admission of the Huila

Petitioner argues that the admission of an unauthenticated letter or memorandum (the "huila") purportedly written by co-defendant Armando Lopez violated Petitioner's right to a fair trial and due process of law.  (Doc. 19 at 4, 23-25.)  Petitioner argues that because the huila was not authenticated, it was irrelevant, not admissible for any purpose, and so prejudicial that it denied his right to a fair trial.  (Doc. 19, 79-82; doc. 45, 13.)  Petitioner contends that its admission was prejudicial because although the jury was instructed not to use the evidence against Petitioner, language in the definition of attempted murder virtually guaranteed that the jury would use the evidence to find Petitioner guilty of attempted murder.  The jury was instructed that if it found that either defendant acted with the appropriate state of mind, it could find them all guilty of attempted premeditated murder.  Armando Lopez's having gone for the neck would have established premeditated intent to kill, which would have been imputed to Petitioner.  (Id. at 25-26.)  Further, the huila was the prosecution's most important evidence of why and how the attack occurred.  (Id. at 9.)

### A.   Standard of Decision and Scope of Review

Title 28 U.S.C. § 2254 provides in pertinent part:

> (d) An application for a writ of habeas corpus on
> behalf of a person in custody pursuant to the
> judgment of a State court shall not be granted

7

with respect to any claim that was adjudicated
on the merits in State court proceedings unless
the adjudication of the claim–

(1) resulted in a decision that was contrary to,
or involved an unreasonable application of, clearly
established Federal law, as determined by the
Supreme Court of the United States; or

(2) resulted in a decision that was based on an
unreasonable determination of the facts in light
of the evidence presented in the State court
proceeding.

Clearly established federal law refers to the holdings, as opposed to the dicta, of the decisions of the Supreme Court as of the time of the relevant state court decision. Cullen v. Pinholster, - U.S. -, 131 S.Ct. 1388, 1399 (2011); Lockyer v. Andrade, 538 U.S. 63, 71 (2003); Williams v. Taylor, 529 U.S. 362, 412 (2000).

A state court's decision contravenes clearly established Supreme Court precedent if it reaches a legal conclusion opposite to, or substantially different from, the Supreme Court's or concludes differently on a materially indistinguishable set of facts. Williams v. Taylor, 529 U.S. at 405-06. A state court unreasonably applies clearly established federal law if it either 1) correctly identifies the governing rule but applies it to a new set of facts in an objectively unreasonable manner, or 2) extends or fails to extend a clearly established legal principle to a new context in an objectively unreasonable manner. Hernandez v. Small, 282 F.3d 1132, 1142 (9th Cir. 2002); see, Williams, 529 U.S. at 407.

8

An application of clearly established federal law is unreasonable only if it is objectively unreasonable; an incorrect or inaccurate application is not necessarily unreasonable. Williams, 529 U.S. at 410. A state court's determination that a claim lacks merit precludes federal habeas relief as long as it is possible that fairminded jurists could disagree on the correctness of the state court's decision. Harrington v. Richter, 562 U.S. -, 131 S.Ct. 770, 786 (2011). Even a strong case for relief does not render the state court's conclusions unreasonable. Id. To obtain federal habeas relief, a state prisoner must show that the state court's ruling on a claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786-87. The standards set by § 2254(d) are "highly deferential standard[s] for evaluating state-court rulings" which require that state court decisions be given the benefit of the doubt, and the Petitioner bear the burden of proof. Cullen v. Pinholster, 131 S.Ct. at 1398. Habeas relief is not appropriate unless each ground supporting the state court decision is examined and found to be unreasonable under the AEDPA. Wetzel v. Lambert, --U.S.--, 132 S.Ct. 1195, 1199 (2012).

In assessing under section 2254(d)(1) whether the state court's legal conclusion was contrary to or an unreasonable application of federal law, "review... is limited to the record that was before the

9

state court that adjudicated the claim on the merits." <u>Cullen v. Pinholster</u>, 131 S.Ct. at 1398.  Evidence introduced in federal court has no bearing on review pursuant to § 2254(d)(1).  <u>Id.</u> at 1400. Further, 28 U.S.C. § 2254(e)(1) provides that in a habeas proceeding brought by a person in custody pursuant to a judgment of a state court, the state court's determination of a factual issue shall be presumed to be correct, and the petitioner has the burden of producing clear and convincing evidence to rebut the presumption of correctness.  A state court decision on the merits and based on a factual determination will not be overturned on factual grounds unless it was objectively unreasonable in light of the evidence presented in the state proceedings.  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003).

Pursuant to § 2254(d)(2), a habeas petition may be granted only if the state court's conclusion was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Section 2254(d)(2) applies where the challenge is based entirely on the state court record or where the process of the state court is claimed to have been defective. <u>Taylor v. Maddox</u>, 366 F.3d 992, 999-1001 (9th Cir. 2004).  Such challenges include claims that a finding is unsupported by sufficient evidence, the state court's process was defective, or the state court failed to make any finding at all.  <u>Id.</u> at 999.  With respect to a contention that the state court adjudication was based

on an unreasonable determination of fact within the meaning of § 2254(d)(2), the state court's determination must be not merely incorrect or erroneous, but rather objectively unreasonable.  Id. For relief to be granted, a federal habeas court must find that the trial court's factual determination was such that a reasonable fact finder could not have made the finding; that reasonable minds might disagree with the determination or have a basis to question the finding is not sufficient.  Rice v. Collins, 546 U.S. 333, 340-42 (2006).

To conclude that a state court finding is unsupported by substantial evidence, a federal habeas court must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.  Taylor v. Maddox, 366 F.3d at 1000.

To determine that a state court's fact finding process is defective in some material way or non-existent, a federal habeas court must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact finding process was adequate.  Taylor v. Maddox, 366 F.3d at 1000.

With respect to each claim raised by a petitioner, the last reasoned decision must be identified to analyze the state court decision pursuant to 28 U.S.C. § 2254(d)(1).  Barker v. Fleming, 423 F.3d 1085, 1092 n.3 (9th Cir. 2005); Bailey v. Rae, 339 F.3d 1107,

11

1112-13 (9th Cir. 2003).  Here, the last reasoned decision was the

decision of the state intermediate appellate court on direct appeal.

(Doc. 37, 15.)

       B.   <u>The State Court's Decision</u>

     On direct appeal to the CCA, Petitioner and his co-defendants

raised three related issues concerning the huila: (1) whether the

huila was authenticated under state law, (2) whether it was properly

admitted in light of its prejudicial effect and probative value, and

(3) whether its admission violated the Petitioner's right to

confrontation and cross-examination.  The state court's decision

sets forth the factual details concerning the huila and the

evidentiary basis for admission of the huila as follows:

> *DISCUSSION*
>
> I. Admission of the "huila "
>
> The defendants raise a number of issues related to the
> admission of the huila found the day after the assault. It
> was written to "Manos" and signed by "Soldier." Deputy
> Teso testified that "Manos" referred to Lucero, who was
> also known as "Lil Man," and that A. Lopez was "Soldier."
> Navarro testified that Lucero was known by two monikers,
> "Lil Man" and "Manos." Lindsay said that A. Lopez was the
> gang member referred to as "Soldier." The huila documented
> that the attempted "removal" of Lindsay occurred on
> October 19, 2006. It explained that the removal was for
> "degenerate acts, use of drugs, heroin, promoting it, and
> spreading negativity amongst our people." It also charged
> Lindsay with numerous prior violations of the gang code.
> The author noted that he had "assisted" in the removal,
> and that he had arrived at the jail on "Thursday, 10-12-
> 06, from DVI, Tracy." After explaining the details of the
> acts leading to the removal, the author stated, "I was the
> hitter. After I hit [Lindsay] a few times, in the chest
> area, I went for the neck. I then noticed my piece broke,

12

and I flushed it. [Lindsay] called 'man down,' and then
the K9's arrived."

Both Lindsay and Teso testified that huilas are used to
communicate within the gang and are carried by designated
couriers from place to place. Huilas are written on very
small pieces of paper to avoid detection, and writing a
huila is a skill learned by gang members.
...
...

The trial court found that only A. Lopez would have known
the exact date of his arrival at the Stanislaus County
Jail. The defendants claim this finding cannot withstand
scrutiny because Lindsay also remembered the date of A.
Lopez's arrival, many months later, and that there were 11
men in the cell who would have known the details of the
assault.

The CCA concluded its analysis of authentication as follows:

Here, the huila was found on one of the cellmates the day
after the assault. It described the assault in detail and
is consistent with the evidence at trial. There was
evidence that huilas are used to communicate with gang
members in other locations in the jail and outside the
jail about gang activity. Teso testified that, because
Lindsay was a gang member with some status, the attack had
to be justified to gang leaders. The manner of the
writing, small print on a small piece of paper, is
consistent with the description of huilas given by Lindsay
and Teso. The huila was signed by "Soldier," a moniker for
A. Lopez. In combination, there is ample circumstantial
and direct evidence that the huila is what the prosecution
purports it to be: a gang communiqué, written by A. Lopez,
reporting the assault on Lindsay. (See *People v. Olguin,
supra*, 31 Cal.App.4th at p. 1372 [lyrics handwritten on
yellow paper properly authenticated as being written by
defendant where they refer to author by defendant's gang
moniker or by nickname easily derived from defendant's
proper name, include references to Southside gang
membership, and could be interpreted as referring to disk-
jockeying, a part-time employment of defendant].)

The other objections to the contents of the huila go to
its weight, not to admissibility. There was a reference to
"Lil Man" in the body of the huila, which might suggest

13

the "Manos" the huila was addressed to was not Lucero. It
seems improbable, however, that A. Lopez would write a
huila to Lucero telling him that he (Lucero) participated
in the assault. Or, if the purpose of the huila was not to
inform, but to memorialize, it also is improbable that A.
Lopez would use two different monikers to refer to the
same person. The record is clear that Lucero is usually
referred to as "Lil Man." The jurors, however, did not see
or hear this reference, and any question they might have
had about why A. Lopez was writing to Lucero was resolved
against Lucero.

People v. Lopez, 2009 WL 1783504 at *3-*4.

The CCA rejected Petitioner's state law contention that the

huila was improperly admitted under Cal. Evid. Code § 352 because it

was highly prejudicial.  The CCA reasoned that the huila was highly

relevant because it tended to prove A. Lopez's culpability, gang

motivation, and possession of a shank; it was not likely to invoke a

purely emotional bias, and although it was prejudicial to the

defense, the prejudice was based on its relevance and high probative

value, which was not a type of prejudice that the statute sought to

prevent.  Id. at *4.

    C.   State Law Rulings

A federal court reviewing a habeas petition pursuant to 28

U.S.C. § 2254 has no authority to review alleged violations of a

state's evidentiary rules.  Jammal v. Van de Kamp, 926 F.2d 918, 919

(9th Cir. 1991).  Because federal habeas relief is available to

state prisoners only to correct violations of the United States

Constitution, federal laws, or treaties of the United States,

federal habeas relief is not available to retry a state issue that

14

does not rise to the level of a federal constitutional violation.

28 U.S.C. § 2254(a); <u>Wilson v. Corcoran</u>, 131 S.Ct. at 16; <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991).  In a habeas corpus proceeding, this Court is bound by the California Supreme Court's interpretation and application of California law unless the interpretation is deemed untenable or a veiled attempt to avoid review of federal questions.  <u>Murtishaw v. Woodford</u>, 255 F.3d 926, 964 (9th Cir. 2001).

Here, there is no indication that the state court rulings were associated with an attempt to avoid federal question review. Accordingly, this Court is bound by the California courts' application of state evidentiary law.  Any claim of misapplication or misinterpretation of that law has previously been dismissed by the Court (doc. 23), and it does not constitute a cognizable basis for relief in this proceeding.

    D.   <u>Federal Due Process Limitations on the Admission of Evidence</u>

With respect to Petitioner's claim that the huila was unreliable, the primary federal safeguards applicable to relevant evidence are provided by the Sixth Amendment's rights to counsel, compulsory process to obtain defense witnesses, and confrontation and cross-examination of prosecution witnesses; otherwise, admission of evidence in state trials is ordinarily governed by state law. <u>Perry v. New Hampshire</u>, - U.S. -, 132 S.Ct. 716, 723 (2012) (Due

Process Clause does not require a trial judge to conduct a preliminary assessment of the reliability of eyewitness identification made under suggestive circumstances not arranged by the police).  The reliability of relevant testimony typically falls within the province of the jury to determine.  Id. at 728-29. Absent improper police conduct or other state action, it is sufficient to test the reliability of evidence through the normal procedures, including the right to counsel and cross-examination, protective rules of evidence, the requirement of proof of guilt beyond a reasonable doubt, and jury instructions.  Id.

     The introduction of evidence alleged to be prejudicial violates the Due Process Clause if the evidence was so arbitrary or prejudicial that its admission rendered the trial fundamentally unfair and violated fundamental conceptions of justice.  Perry v. New Hampshire, 132 S.Ct. at 723; Estelle v. McGuire, 502 U.S. at 67-69; Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009). Where a state court has rendered a decision on a federal claim, under the AEDPA even the clearly erroneous admission of evidence that renders a trial fundamentally unfair may not permit the grant of habeas relief unless forbidden by clearly established federal law as established by the Supreme Court.  Holley v. Yarborough, 568 F.3d at 1101.  The Supreme Court has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.

See, Estelle, 502 U.S. at 75 n.5.  Absent such clearly established federal law, it cannot be concluded that a state court's ruling was contrary to or an unreasonable application of Supreme Court precedent under the AEDPA.  Holley, 568 F.3d at 1101 (citing Carey v. Musladin, 549 U.S. 70, 77 (2006)); see also Alberni v. McDaniel, 458 F.3d 860, 866B67 (9th Cir. 2006) (denying a due process claim concerning the use of propensity evidence for want of a "clearly established" rule from the Supreme Court); Mejia v. Garcia, 534 F.3d 1036, 1046 (9th Cir. 2008).

Admission of evidence violates due process only if there are no permissible inferences that a jury may draw from it, and the evidence is of such quality as necessarily prevents a fair trial. Boyde v. Brown, 404 F.3d 1159, 1172-73 (9th Cir. 2005) (quoting Jammal v. Van de Kamp, 926 F.2d at 920).  To the extent the CCA decided the federal due process issue, there is no clear Supreme Court holding that introduction of analogous evidence violates due process and requires habeas relief.

Although the state court addressed the relevance, probative value, and prejudicial effect of the huila, it did not expressly determine whether the admission of the huila rendered the proceeding fundamentally unfair under federal due process standards.  Where a state court did not reach the merits of a claim, federal habeas review is not subject to the deferential standard that applies under § 2254(d) to "any claim that was adjudicated on the merits in State court proceedings"; rather, the claim is reviewed de novo.  Cone v.

17

<u>Bell</u>, 556 U.S. 449, 472 (2009).  This Court will thus proceed to consider more generally whether Petitioner's due process right to a fair trial was violated by admission of the huila.

First, the state court's finding that the evidence was relevant because it was authenticated was not unreasonable in light of the evidence before the state court.  This included the discovery of the huila in a cellmate's cell at a time near the pertinent events and multiple internal indicia which, when considered with the testimony of the victim and the gang expert and other evidence in the case, tended strongly to identify the writer of the document, the nature of the document, and the time the document was prepared.  In light of the multiple sources of authentication, the state court's conclusion was not objectively unreasonable; an appellate panel, applying the normal standards of appellate review, could reasonably conclude that the finding was supported by the record.  Petitioner has not shown that the evidence was irrelevant or unreliable because unauthenticated.

The evidence was also relevant to show the criminal conduct, states of mind and motivation of the perpetrators, as well as their identity, and the possession of a shank.  It also bore on the gang allegations.  Review of the huila shows that there were numerous permissible inferences a jury could draw from the huila.  The huila also had significant probative value because it not only confirmed other evidence of the pertinent events and tended to establish

18

elements of the charged offenses, but it also provided a cultural context that reflected the viciousness and collective nature of the attack.

The huila was not of such a quality that prevented a fair trial. Although Petitioner asserts that the jury must have used it against him to infer state of mind vicariously, there was ample independent evidence tending to show that Petitioner, who according to the victim was present and kicked the victim when he was down, harbored the intent to kill. The jury was also instructed not to use the huila against Petitioner. The fact that the addressee of the huila shared Petitioner's moniker established that Petitioner was not a participant in the attack. In light of the totality of the circumstances, the admission of the huila did not deny Petitioner a fair trial or render the proceedings fundamentally unfair.

Accordingly, it will be recommended that the Court deny Petitioner's claim that he suffered a violation of his right to due process or to a fair trial as a result of the admission of the huila.

IV.   Right to Confrontation and Cross-Examination

Petitioner argues that admitting the huila, an incriminating statement of co-defendant Armando Lopez, violated Petitioner's right to confront and cross-examine the maker of the huila protected by the Sixth and Fourteenth Amendments. Petitioner further contends

19

that redacting the document and instructing the jury that the huila could not be used against him or the co-defendants did not cure the error.

Respondent does not address this claim except to assert that because the huila was not testimonial, there is no Confrontation Clause claim.  (Ans., doc. 37, 17.)  However, even if the huila were not testimonial, the huila remains an admission or confession of a party properly admitted against its maker but not properly admitted against Petitioner unless its admission comports with the protections afforded by the Confrontation Clause.

A.   The State Court Decision

The decision of the CCA on this claim is as follows:

C. *Aranda-Bruton* rule

Finally, with respect to the huila, P. Lopez and Lucero also challenge its admission on *Aranda-Bruton* grounds, arguing that their Sixth Amendment right to cross-examine the author of the huila was violated. Under the *Aranda-Bruton* rule, it is error in a joint criminal trial to admit an admission by a nontestifying codefendant that incriminates another codefendant, even if the jury is instructed not to consider the hearsay as evidence against the other codefendant. (*Aranda, supra*, 63 Cal.2d at pp. 528-530; *Bruton, supra*, 391 U.S. at p. 126.) The rule is motivated by the concern that incriminating a defendant by a nontestifying codefendant's hearsay violates the defendant's rights under the confrontation clause of the Sixth Amendment to confront and cross-examine his accusers. (*Bruton, supra*, at pp. 126, 136; *People v. Fletcher* (1996) 13 Cal.4th 451, 455, 465 (*Fletcher*).) The rule applies even where the hearsay statement has been redacted or sanitized to replace the nondeclarant defendant's name with a blank space, the word "delete," or some unique symbol. (*Gray v. Maryland* (1998) 523 U.S. 185, 188, 194-195 (*Gray*); *Fletcher, supra*, at p. 455.)

On the other hand, the rule has been held not to require

20

exclusion of evidence (or separate trials) where the
codefendant's confession is redacted to eliminate any
indication that there was another perpetrator. Under these
circumstances, the confession can be admitted in a joint
trial with a limiting instruction. (*Richardson v. Marsh*
(1987) 481 U.S. 200, 203, 211 (*Richardson*); *Fletcher*,
*supra*, 13 Cal.4th at p. 455 [issue is whether reference is
"facially incriminating" of nondeclarant defendant].) In
an attempt to avoid *Aranda–Bruton* issues, the trial court
ordered that the huila's reference to three "bombers,"
"Lil Man, Mugsy and Scorpion" (Lucero, P. Lopez and
McKenzie), be redacted. The jury was given a limiting
instruction telling them that it was not to consider the
huila against any defendant other than A. Lopez.

The defendants recognize that the rule in *Bruton* has been
restricted by *Richardson* and *Fletcher* and argue that,
despite the redaction, the huila as read to the jurors
falls within the protection of *Aranda–Bruton* because it
includes the statement that the author "assisted" in the
assault. According to defendants, this reference implies
that others participated in the assault and runs afoul of
the rules for admission described in *Richardson* and
*Fletcher*. We disagree.

In *Richardson*, the United States Supreme Court held that
"the Confrontation Clause is not violated by the admission
of a nontestifying codefendant's confession with a proper
limiting instruction when, as here, the confession is
redacted to eliminate not only the defendant's name, but
any reference to his or her existence." (*Richardson,
supra*, 481 U.S. at p. 211, fn. omitted.) The court
distinguished the redacted confession before it from the
confession at issue in *Bruton*, because the redacted
confession was not incriminating on its face, but became
so only when linked to other evidence. (*Richardson, supra*,
at p. 208.) In *Gray*, the Supreme Court considered a
confession that was redacted to replace the defendant's
name with an obvious indication of deletion, such as the
word "deleted" or a symbol. (*Gray, supra*, 523 U.S. at p.
192.) The court determined that this type of case turned
not on whether an inference was required to incriminate
the defendant, but on the type of inference required. If
the confession made a direct reference to a perpetrator
other than the speaker and the jury immediately could
infer, without considering other evidence, that that
perpetrator was the defendant, then admission of the

21

confession was *Bruton* error despite a limiting
instruction. (*Gray, supra*, at p. 196.)

In *Fletcher*, the California Supreme Court considered
whether "it is sufficient, to avoid violation of the
confrontation clause, that a nontestifying codefendant's
extrajudicial confession is edited by replacing all
references to the nondeclarant's name with pronouns or
similar neutral and nonidentifying terms." It recognized
that "[s]uch a confession is 'facially incriminating' in
the sense that it is sufficient by itself, without
reference to any other evidence, to incriminate someone
other than the confessing codefendant. It is not 'facially
incriminating' only in the sense that it does not identify
this other person by name." (*Fletcher, supra*, 13 Cal.4th
at p. 456.) The court concluded:

> "[W]hether this kind of editing—which retains
> references to a coparticipant in the crime but
> removes references to the coparticipant's name—
> sufficiently protects a nondeclarant defendant's
> constitutional right of confrontation may not be
> resolved by a 'bright line' rule of either
> universal admission or universal exclusion.
> Rather, the efficacy of this form of editing
> must be determined on a case-by-case basis in
> light of the other evidence that has been or is
> likely to be presented at the trial. The editing
> will be deemed insufficient to avoid a
> confrontation violation if, despite the editing,
> reasonable jurors could not avoid drawing the
> inference that the defendant was the
> coparticipant designated in the confession by
> symbol or neutral pronoun." (*Fletcher, supra*, 13
> Cal.4th at p. 456.)

In this case, we conclude that the editing complies with
the rule set forth in *Richardson, Gray*, and *Fletcher*. With
respect to P. Lopez, there is no reference in the huila
that could support an inference that he assisted in the
assault absent consideration of independent trial
evidence. There were 11 men in the cell other than Lindsay
who could have assisted in the assault, and nothing in the
huila links those assisting to P. Lopez. We are not
persuaded by the argument that the jury could easily infer
the identities of those who "assisted" Soldier in the
assault from Lindsay's testimony that it was only when the

prosecutor told him the four defendants would be
prosecuted that Lindsay would identify his assailants. The
*Aranda-Bruton* rule does not extend to those situations in
which independent evidence reveals either directly or
indirectly who is implicated by a codefendant's
confession. As the court in *Gray* stated, it is only when
the jury can immediately infer, without considering other
evidence, that that perpetrator was a defendant, that the
admission of the confession violated *Aranda-Bruton*. (*Gray,
supra*, 523 U.S. at p. 196.)

The issue is more complicated with respect to Lucero. The
huila was written to "Manos." There was testimony at trial
that Lucero, in addition to being known as "Lil Man," was
also known as "Manos," even though as we have pointed out
the internal reference to "Lil Man" makes it less likely
the "Manos" of the huila and the "Manos" of the cell are
the same person. As a result, the editing did not
eliminate all reference to Lucero. We conclude that the
reference to "Manos" is not facially incriminating in
relation to the assault. Given the context of the
reference, e.g., the naming of the person to whom the
huila is written, it is unlikely the jury would have
concluded that "Manos" was one who "assisted" in the
assault in the absence of independent trial evidence.

The reference, however, is incriminating in relation to
the gang-participation count, because it established
"Manos," whom the jury understood to be Lucero, as a gang
member of status, to whom other gang members would report.
Although a close call, we believe, under *Aranda-Bruton*,
the huila should not have come in as to Lucero.

*Aranda-Bruton* error is not reversible per se, but does
implicate a constitutional right and is therefore subject
to review under the harmless-beyond-a-reasonable-doubt
standard of *Chapman v. California* (1967) 386 U.S. 18
(*Chapman*). (*People v. Song* (2004) 124 Cal.App.4th 973,
981; *People v. Anderson* (1987) 43 Cal.3d 1104, 1128.)
There was a significant amount of independent evidence
that A. Lopez, Lucero, and P. Lopez assaulted Lindsay. The
jury obviously found Lindsay to be believable; it
convicted the three defendants on direct testimony from
Lindsay that they hit or kicked him, but acquitted
McKenzie on Lindsay's testimony that he did not see
McKenzie participate in the attack. There was also
independent evidence of serious injury, verification of

physical injuries consistent with Lindsay's account,
independent evidence of opportunity and motive, as well as
other evidence of guilt. Although the defense tends to
discount Lindsay's version of events, he obviously did not
fake his attack. Having reviewed the entire record, we
conclude that the admission of the huila, even if found to
violate the defendants' constitutional rights, was
harmless beyond a reasonable doubt.

People v. Lopez, 2009 WL 1783504 at *5-*7.

        B.   Analysis

     The Confrontation Clause of the Sixth Amendment, made binding

on the states by the Fourteenth Amendment, provides that in all

criminal cases, the accused shall have the right to confront the

witnesses against him.  Pointer v. Texas, 380 U.S. 400 (1965).  The

main purpose of confrontation is to afford the opportunity for

cross-examination to permit the opponent to test the believability

of the witness and the truth of his or her testimony by examining

the witness's story, testing the witness's perceptions and memory,

and impeaching the witness.  Delaware v. Van Arsdall, 475 U.S. 673,

678 (1986); Davis v. Alaska, 415 U.S. 308, 316 (1974).  Even if

there is a violation of the right to confrontation, habeas relief

will not be granted unless the error had a substantial and injurious

effect or influence in determining the jury's verdict.  Jackson v.

Brown, 513 F.3d 1057, 1084 (9th Cir. 2008) (citing Brecht v.

Abrahamson, 507 U.S. 619, 637 (1993)).

     Under Bruton v. United States, 391 U.S. 123, 135-36 (1968), the

admission of oral testimony relating a powerfully incriminating

24

extrajudicial confession made by a non-testifying co-defendant who expressly names the defendant violates the Confrontation Clause when that statement is presented to the jury in a joint trial.  The nature of accomplice testimony as inherently suspect because an accomplice generally has a strong motivation to inculpate others and exculpate himself or herself.  Further, where the extrajudicial statement on its face expressly implicates the defendant, the risk the jury cannot or will not follow a limiting instruction not to use it against the defendant is great, and the consequences of failure are "vital" to the accused.  Id. at 135-36.

However, the Confrontation Clause is not violated by the admission of a non-testifying co-defendant's confession with a proper limiting instruction when the confession is redacted to eliminate not only the defendant's name, but also any reference to his or her existence, even though the defendant is linked to the confession by other evidence properly admitted at trial.  Richardson v. Marsh, 481 U.S. 200, 208, 211 (1987).  In Richardson, the co-defendant's extrajudicial statement related a conversation among third parties which, when combined with the defendant's own testimony that established her presence when the conversation occurred, implicated the defendant as an accomplice.  The statement was not a direct accusation of the defendant, and it did not facially or expressly implicate the defendant as an accomplice.  Id. at 208.  The Court reasoned that in such circumstances, there is not

25

the same overwhelming probability that the jury will be unable to disregard the evidence -- a probability that the Court characterized as "the foundation of Bruton's exception" to the rule that a limiting instruction can cure any prejudice.  Id.  The Court stated that the calculus changes when the confession does not name the defendant; thus, redaction thus can remedy the effect of admission of much of the evidence.  Id. at 208-09.

The Bruton rule prohibiting introduction during a joint trial of the confession of a non-testifying co-defendant which names the defendant as a perpetrator extends also to redacted confessions in which the co-defendant names the defendant, but that name is replaced by a blank space, the word "deleted," or a similar symbol. Gray v. Maryland, 523 U.S. 185 (1998).  The Court in Gray reasoned that a jury's reaction to such a form of confession may be similar to its reaction to a facially incriminating confession; the redaction may actually fuel speculation and overemphasize the importance of the confession.  Id. at 193.  Finally, just as with the confession in Bruton, the specific redacted confession before the Court functioned grammatically as an open and direct accusation of a specific defendant.  The Court contrasted Richardson, where the extrajudicial statement simply recounted a conversation among third parties and did not point to a defendant directly or otherwise constitute an out-of-court accusation.  Id. at 194.  The Court acknowledged that the degree of clarity with which a statement

refers to a specific defendant could vary and range from an express

naming, to a nickname, to a blank or deletion, and in some instances

the person to whom a blank refers may not be clear.  Id. at 194.

The Court rejected the proposition that an extrajudicial statement

necessarily avoids the Bruton exclusion simply because the jury must

make an inference to connect the statement with the defendant.  The

Court instead focused on whether the statement, even if redacted,

took the form of a facial and direct accusation; the clarity of the

reference to a specific individual; and the immediacy of the

inferences of identity and criminal participation.  The Court stated

the following in pertinent part:

> ...[W]e do not believe Richardson controls the result
> here. We concede that Richardson placed outside the scope
> of Bruton's rule those statements that incriminate
> inferentially. 481 U.S., at 208, 107 S.Ct., at 1707-1708.
> We also concede that the jury must use inference to
> connect the statement in this redacted confession with the
> defendant. But inference pure and simple cannot make the
> critical difference, for if it did, then Richardson would
> also place outside Bruton's scope confessions that use
> shortened first names, nicknames, descriptions as unique
> as the "red-haired, bearded, one-eyed man-with-a-limp,"
> United States v. Grinnell Corp., 384 U.S. 563, 591, 86
> S.Ct. 1698, 1714, 16 L.Ed.2d 778 (1966) (Fortas, J.,
> dissenting), and perhaps even full names of defendants who
> are always known by a nickname. This Court has assumed,
> however, that nicknames and specific descriptions fall
> inside, not outside, Bruton's protection. See Harrington
> v. California, 395 U.S. 250, 253, 89 S.Ct. 1726, 1728, 23
> L.Ed.2d 284 (1969) (assuming Bruton violation where
> confessions describe codefendant as the "white guy" and
> gives a description of his age, height, weight, and hair
> color). The Solicitor General, although supporting
> Maryland in this case, concedes that this is appropriate.
> Brief for United States as Amicus Curiae 18-19, n. 8.

27

1
2
3
4
5
6
7
8
9
10
11
12

> That being so, <u>Richardson</u> must depend in significant part
> upon the kind of, not the simple fact of, inference.
> <u>Richardson's</u> inferences involved statements that did not
> refer directly to the defendant himself and which became
> incriminating "only when linked with evidence introduced
> later at trial." 481 U.S., at 208, 107 S.Ct., at 1707. The
> inferences at issue here involve statements that, despite
> redaction, obviously refer directly to someone, often
> obviously the defendant, and which involve inferences that
> a jury ordinarily could make immediately, even were the
> confession the very first item introduced at trial.
> Moreover, the redacted confession with the blank prominent
> on its face, in <u>Richardson's</u> words, "facially
> incriminat[es]" the codefendant. <u>Id.</u>, at 209, 107 S.Ct.,
> at 1708 (emphasis added). Like the confession in <u>Bruton</u>
> itself, the accusation that the redacted confession makes
> "is more vivid than inferential incrimination, and hence
> more difficult to thrust out of mind." 481 U.S., at 208,
> 107 S.Ct., at 1707.

13

<u>Gray</u>, 523 U.S. at 195-96.

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Here, portions of the narrative covering information about the attack itself were blacked out; however, the only person referred to as one who participated in any conduct during the attack is the writer of the huila, Armando Lopez. After the huila describes the conduct that precipitated the victim's removal from the gang, the writer of the huila stated, "Before program shut down. (Blacked out portion,) I was the hitter. (Blacked out portion.)" The writer then described hitting the victim a few times, going for the neck, and flushing the piece. The huila then continued, "(Blacked out portion.)" The writer reported that the victim called "man down", and the K-9 unit arrived. The writer then thanked and excused himself. (LD 16, Clerk's Supp. Trans.; LD 1, Petr.'s petn. for review filed in the CSC July 29, 2009, at p. 7 [citing People's

28

exhibit 22].)

Petitioner contends the huila had obvious marks of deletion, suggesting participation of a third person; redaction did not eliminate any indication that there was another perpetrator; and the huila and the victim's identifications could be the only sources of connection of Petitioner with the crime.  (Doc. 45, 11-12.)

The writer of the huila identified himself as the "hitter" and stated that he "assisted" in the assault.  The deletions occurred when it would have been natural for a chronicler to describe the remainder of the assault, including the conduct of the others whom he stated he assisted.  Thus, the huila permitted a direct inference that others participated in the assault and an inference that they performed functions in the removal process other than stabbing; it did not eliminate any indication that there was another perpetrator. In this sense, it directly referred to other perpetrators without consideration of other evidence.  However, consideration of other evidence (the victim's testimony, physical evidence, and evidence concerning injuries and treatment) was necessary to draw any detailed inferences that the conduct the others engaged in was criminal assault or attempted murder.

The huila is expressly directed to "Manos," a gang moniker for Petitioner.  Because Petitioner was also known as "Li'l Man," the reference is not entirely clear.  It is also an unlikely inference that Armando Lopez directed the huila, which chronicles the removal

in a third-person narration, to Petitioner if Petitioner participated in the attack and thus was a subject of the narration itself.  Inferences that Petitioner participated in the removal were not immediate, certain, or even probable.  Nevertheless, the direction of the huila to Manos permitted an inference that Petitioner engaged in gang activity as someone with gang authority.

In sum, the huila shared some characteristics of a facially incriminatory confession.  Under these circumstances, a fairminded jurist might reasonably conclude that as to the offenses against the person of the victim, admission of the huila against Petitioner was not within the rule of Bruton.

As the state court noted, with respect to the gang enhancement allegations, the inferences to be drawn from the huila concerning Petitioner's gang affiliation were much stronger and more immediate than in the case of Petitioner's responsibility for the attack.  Not only was Petitioner independently identified as "Manos," who was in charge of gang security in his unit, but the huila itself, which constituted a foundational document in the gang's system of accountability and control, was also directed to Petitioner.  As Petitioner notes, in light of Teso's testimony, which identified Petitioner as "Manos" and "Little Man" and the gang member in charge of security in the unit, and because the message was written as a report to be sent to gang superiors, it was strongly indicative of Petitioner's participation.  (Doc. 45, 14.)

However, even if the state court's decision as to the limited nature of the violation of confrontation rights was an unreasonable application of clearly established federal law, the state court's determination that any violation was not prejudicial was not unreasonable.  The error must have had a substantial and injurious effect or influence in determining the jury's verdict.  <u>Brecht v. Abrahamson</u>, 507 U.S. at 637.  Here, the jury appears to have accepted the significant independent evidence of Petitioner's guilt of the attack, which included the victim's testimony regarding the identity and conduct of his attackers and the expert's testimony regarding the process of gang removal and control; evidence of serious injury to the victim and verification of physical injuries consistent with the victim's account; and evidence of opportunity and motive.

Petitioner contends it is likely the jury relied on the huila in finding wrongful intent, specifically premeditation, on the part of Armando Lopez and then imputed that state of mind to Petitioner. (Doc. 19 at 4, 27-29.)  In argument, the prosecutor relied on the huila and the victim's testimony as the main evidence of guilt; the huila was the primary evidence of motive, opportunity, intent, premeditation, and attempt; the prosecutor emphasized how the huila corroborated the victim's version of the events.  (4 RT 890-902.)

However, Petitioner's contention that the huila was the only evidence that Armando Lopez attacked the victim with a weapon he

31

then flushed down the toilet, is not supported by the record.

Although no weapon was seen by the victim, discovered in the jail

search, or reported to the medical staff who treated Petitioner

after the attack, there was other evidence of the weapon.  The

victim reviewed a photograph (People's number 2) and testified that

he observed a puncture mark right below his right pectoral muscle;

across the right side of his pectoral about two inches from his

nipple area, the victim observed "a slice, a scrape and some more

tattoo."  (II RT 343.)  These marks were not present before the

offense date.  (Id.)  The marks were consistent with the victim's

testimony that he pushed away Armando Lopez's hand after Lopez came

up from behind and the victim had felt a thump in the chest.  The

testimony of the victim and the gang expert concerning the victim's

conduct with the heroin and gang customs and expectations also

provided a basis for inferring gang association and behavior, as

well as a gang-related motivation for the attack.  The victim's

testimony concerning the ruse of a card game to which the victim was

invited by Petitioner and his description of the concerted and

vicious nature of the attack provided an independent basis for

inferring intent and premeditation.

     In sum, the record supports a conclusion that any improper

limitation of Petitioner's rights to confrontation and cross-

examination did not result in the prejudice required for habeas

relief because it did not have a substantial and injurious effect or

influence in determining the jury's verdict.  Accordingly, it will be recommended that Petitioner's Confrontation Clause claim be denied.

## V.  Insufficiency of the Evidence

Petitioner contends that he suffered a due process violation due to insufficiency of the evidence to support Petitioner's conviction of possessing a shank in custody in violation of Cal. Pen. Code § 4502(a) (count three) based on the fact that absent the huila, the only evidence of the shank was the previously discussed evidence of a puncture mark on the victim's chest.  Petitioner contends this evidence is not substantial because the victim failed to complain of a puncture wound during medical examination and treatment after the offense; there is no notation of the wound in the medical report; and not only did the victim return to the jail from the hospital the same night, but jail personnel also said that he would be fine.  (Doc. 19 at 5, 29-31, 83-86.)[2]

### A.  The State Court Decision

After articulating legal standards consistent with the Jackson standard discussed in the analysis that follows, the CCA decided the issue as follows:

A. Shank possession

P. Lopez and Lucero argue that there is insufficient evidence to sustain the conviction for possession of a shank while in custody (§ 4502, subd. (a)). They contend the shank was never found, Lindsay's medical reports do not document any puncture wound, and Lindsay admitted that he had not seen a shank. Lindsay did not testify that he

---

[2] Insofar as Petitioner argues that the insufficiency of the evidence violates rights conferred by the constitution of California, Petitioner's claim is based on state law and was previously dismissed from the FAP.

was stabbed, but only that he was "hit" in the chest. The huila, which references the shank, was admitted only against A. Lopez and, as a result, could not be considered against P. Lopez or Lucero. To constitute possession, the statute requires that the weapon be in the inmate's custody or control. (§ 4502, subd. (a); *In re Daniel G.* (2004) 120 Cal.App.4th 824, 831 [possession may be actual or constructive; constructive possession requires proof that inmate knowingly exercises control or right to control weapon].)

The Attorney General argues in response that the injuries suffered by Lindsay are sufficient circumstantial evidence that P. Lopez and Lucero constructively possessed a shank during the attack. Lindsay had a small puncture-like wound on this chest and scrapes on his arms consistent with his testimony that he was hit in the chest and attempted to fend off a deadly blow to his neck. He also had scrapes on his neck consistent with a sharp instrument. In addition, the Attorney General relies on the testimony of Deputy Teso, who stated that all gang members are supposed to have access to a weapon, P. Lopez's statements to Lindsay to close his eyes, and A. Lopez's statement that Lindsay was lucky to be alive, as evidence that the gang intended the attack to be fatal. Teso testified that fatal "removals" involve weapons.

We conclude there is sufficient evidence to support a finding that P. Lopez and Lucero constructively possessed a shank while in custody. Other than the huila, there is evidence that a shank was used in the attack. Lindsay heard whispering while he was in the shower, and the card game invitation was obviously a ruse requiring more than one participant. P. Lopez was grinning and told Lindsay, in essence, to die. The circumstances and context of the attack are sufficient to support a finding that all three defendants had constructive possession of a weapon, were working together, and intended to kill Lindsay.

Although the jury found the three men not guilty of assault with a deadly weapon (which was presented to the jury on the theory that the shank was a deadly weapon), the jury's verdict on this count likely rests on the superficial wounds suffered by Lindsay and the quickness with which the shank disappeared from the fight. In any event, the acquittal does not preclude a finding of guilt on the possession count.

34

1  <u>People v. Lopez</u>, 2009 WL 1783504 at *7-*8.

2        B.  <u>Analysis</u>

3        To determine whether a conviction violates the constitutional

4  guarantee of due process of law because of insufficient evidence, a

5  federal court ruling on a petition for writ of habeas corpus must

6
7  determine whether any rational trier of fact could have found the

8  essential elements of the crime beyond a reasonable doubt.  <u>Jackson</u>

9  <u>v. Virginia</u>, 443 U.S. 307, 319, 20-21 (1979); <u>Windham v. Merkle</u>, 163

10 F.3d 1092, 1101 (9th Cir. 1998); <u>Jones v. Wood</u>, 114 F.3d 1002, 1008

11 (9th Cir. 1997).

12        All evidence must be considered in the light most favorable to

13 the prosecution.  <u>Jackson</u>, 443 U.S. at 319; <u>Jones</u>, 114 F.3d at 1008.

14
15 It is the trier of fact's responsibility to resolve conflicting

16 testimony, weigh evidence, and draw reasonable inferences from the

17 facts; it must be assumed that the trier resolved all conflicts in a

18 manner that supports the verdict.  <u>Jackson v. Virginia</u>, 443 U.S. at

19
20 319; <u>Jones</u>, 114 F.3d at 1008.  The relevant inquiry is not whether

21 the evidence excludes every hypothesis except guilt, but whether the

22 jury could reasonably arrive at its verdict.  <u>United States v.</u>

23 <u>Mares</u>, 940 F.2d 455, 458 (9th Cir. 1991).  Circumstantial evidence

24 and the inferences reasonably drawn therefrom can be sufficient to

25 prove any fact and to sustain a conviction, although mere suspicion

26
27 or speculation does not rise to the level of sufficient evidence.

28 <u>United States v. Lennick</u>, 18 F.3d 814, 820 (9th Cir. 1994); <u>United</u>

States v. Stauffer, 922 F.2d 508, 514 (9th Cir. 1990); see Jones v. Wood, 207 F.3d at 563.  The court must base its determination of the sufficiency of the evidence from a review of the record.  Jackson at 324.

The Jackson standards must be applied with reference to the substantive elements of the criminal offense as defined by state law.  Jackson, 443 U.S. at 324 n.16; Windham, 163 F.3d at 1101. However, the minimum amount of evidence that the Due Process Clause requires to prove an offense is purely a matter of federal law. Coleman v. Johnson, - U.S. -, 132 S.Ct. 2060, 2064 (2012) (per curiam).  For example, under Jackson, juries have broad discretion to decide what inferences to draw and are required only to draw reasonable inferences from basic facts to ultimate facts.  Id.

Under the AEDPA, federal courts must also apply the standards of Jackson with an additional layer of deference.  Coleman v. Johnson, - U.S. -, 132 S.Ct. 2060, 2062 (2012); Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  This Court thus asks whether the state court decision being reviewed reflected an objectively unreasonable application of the Jackson standard to the facts of the case.  Coleman v. Johnson, 132 S.Ct. at 2062; Juan H. v. Allen, 408 F.3d at 1275.  The determination of the state court of last review on a question of the sufficiency of the evidence is entitled to considerable deference under 28 U.S.C. § 2254(d).  Coleman v. Johnson, 132 S.Ct. at 2065.

Here, the CCA applied standards that are consistent with the Jackson standards.  The CCA properly considered the totality of the evidence, including what the victim saw, felt, and overheard; Lopez's statement during the attack; customary use of, and access to, weapons in gang removals; Petitioner's invitation to the victim to play cards and the gathering for the game, which was reasonably inferred to be a ruse; and the evidence of the victim's injuries. It must be assumed that in the event of a conflict, the trier of fact drew all inferences in favor of the judgment; thus, there was ample evidence for a rational trier of fact to conclude that the co-defendants were working in concert and shared not only the intent to kill the victim, but also constructive possession of the weapon under state law.

There is no merit to Petitioner's contention that the state court's decision on the sufficiency of the evidence was unreasonable because the state court failed to hold an evidentiary hearing.  (See doc. 45, 25-26.)  The Jackson determination is based solely on the evidence submitted to the trial court.  Cullen v. Pinholster, 131 S.Ct. at 1398.

In sum, the state court properly concluded there was sufficient evidence to support Petitioner's conviction of possession of a shank.

VI.   Coaching of the Victim's Testimony

Petitioner argues his conviction must be reversed because he suffered a violation of due process when Deputy Sheriff Paul Teso coached the victim with respect to his testimony despite a ruling prohibiting communication among witnesses regarding their testimony. Petitioner points to inconsistent testimony by the victim given on

two successive days of trial as to when A. Lopez arrived at the

jail.  Petitioner also argues that because the victim knew Lopez's

arrival date, this evidence undercuts the trial court's finding that

only the author of the huila would have known when he arrived at the

jail.  (Doc. 19 at 57-59.)

A.   The State Court Decision

The decision of the CCA on this issue is as follows:

IV. Alleged coaching of witness

The defendants contend that they were denied due process
and a fair trial because Lindsay was coached by Deputy
Teso to change his trial testimony. Teso escorted Lindsay
to trial each day and therefore had an opportunity to
speak with him outside of the courtroom. In addition, Teso
was the designated investigator and the gang expert for
the prosecution so he was aware of the legal issues and
proof needed in the prosecution case. On May 7, 2007,
Lindsay testified that A. Lopez had come to the Stanislaus
County Jail from state prison a "week before" October 19,
2006. The next day, on May 8, 2007, Lindsay testified that
A. Lopez came from state prison, "probably" 10 days before
the 19th, "maybe the 9th, 8th, something of that week."
The jail records established that A. Lopez arrived at the
jail on October 12, exactly seven days prior to the 19th.

In admitting the huila, the trial court found the
statement in it that A. Lopez had arrived on October 12
was information only A. Lopez would have in his
possession. The defendants argue that Lindsay's initial
testimony that A. Lopez came to the jail the week before
October 19 equates to testimony that A. Lopez arrived at
the jail precisely on October 12 and therefore undercuts
the trial court's finding with respect to the huila. The
defendants also argue that Lindsay's change of testimony
on this key point supports an inference that Lindsay
changed his testimony after being coached by Teso.FN5 We
disagree.

FN5. At trial the bulk of the argument presented
on this issue related to the prosecution gaining
additional discovery from the conversations
between Teso and Lindsay. The defense asked that
a different security escort be assigned. When

38

> the court refused to do so, the defense asked
> that all conversations between Teso and Lindsay
> be taped. The court denied the request but did
> order that if any new evidence was discovered,
> the prosecution was to provide it immediately to
> the defense. During cross-examination, the
> defense focused on the same issue. Lindsay was
> asked whether he told Teso things about gang
> life. Lindsay said he and Teso talked about lots
> of different things, but not about gang life.
> Lindsay said they talked mainly about his
> feelings and his fear of testifying. Teso also
> testified that he and Lindsay talked to each
> other during the transport, but not about gangs
> or gang involvement. Despite an opportunity to
> do so, the defense failed to cross-examine
> either Teso or Lindsay about whether they
> discussed Lindsay's change in testimony
> concerning the date A. Lopez arrived at the
> jail.

We have already concluded that, notwithstanding the trial court's reasoning, the huila was properly authenticated. Second, we are not certain Lindsay's initial statement that A. Lopez came to the jail the week before October 19 must be read to mean he arrived on an exact date: October 12. The term "one week ago" does not always mean a specific calendar date exactly seven days prior but instead establishes a time frame. Although Lindsay's later testimony appears to expand the time frame to 10 days, the change is not significant enough to undercut the trial court's finding regarding the admission of the huila.

Even if we were to conclude that Lindsay actually changed his testimony to assist the prosecution, there is nothing in the record to suggest that Teso coached Lindsay to do so. There are many possibilities to explain the slight change in Lindsay's testimony. For example, he may simply have remembered the time frame differently. Upon being questioned by the prosecution a second time, Lindsay might have been less confident in his earlier recollection. Further, Lindsay, who had transcripts and records in his possession, might have reached his own conclusion about the impact his prior testimony had on the prosecution and decided to change it to benefit the prosecutor's case. Any of these reasons are just as plausible as concluding that Teso coached Lindsay. (See *People v. Gray* (2005) 37

1  Cal.4th 168, 230; *In re Avena* (1996) 12 Cal.4th 694, 738;
2  *People v. Williams* (1988) 44 Cal.3d 883, 933.)

3  People v. Lopez, 2009 WL 1783504 at *11-*12.

4          B.  Analysis

5      A prosecutor's improper conduct violates the Constitution only

6  if it so infects the trial with unfairness as to make the resulting

7  conviction a denial of due process.  Parker v. Matthews, – U.S. –,

8  132 S.Ct. 2148, 2153 (2012) (per curiam); see, Darden v.

9
10  Wainwright, 477 U.S. 168, 181 (1986).  Prosecutorial misconduct

11  deprives the defendant of a fair trial as guaranteed by the Due

12  Process Clause if it prejudicially affects the substantial rights

13  of a defendant.  United States v. Yarbrough, 852 F.2d 1522, 1539

14
15  (9th Cir. 1988) (citing Smith v. Phillips, 455 U.S. 209, 219

16  (1982)).  However, the standard of review of claims concerning

17  prosecutorial misconduct § 2254 proceedings is the narrow standard

18  of due process, and not the broad exercise of supervisory power;

19  improper argument does not, per se, violate a defendant's

20  constitutional rights.  Mancuso v. Olivarez, 292 F.3d 939, 957 (9th

21  Cir. 2002) (citing Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir.

22
23  1996)).  This Court must thus determine whether the alleged

24  misconduct has rendered a trial fundamentally unfair.  Darden v.

25  Wainwright, 477 U.S. at 183.  It must be determined whether the

26  prosecutor's actions constituted misconduct, and whether the

27
28
                              40

conduct violated Petitioner's right to due process of law.  <u>Drayden v. White</u>, 232 F.3d 704, 713 (9th Cir. 2000).

To grant habeas relief, the state court's rejection of the prosecutorial misconduct claim must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Parker v. Matthews</u>, 132 S.Ct. at 2155 (quoting <u>Harrington v. Richter</u>, 131 S.Ct. at 767-87).  In addition, the standard of <u>Darden v. Wainwright</u> is a very general one that leaves courts with more leeway in reaching outcomes in case-by-case determinations.  <u>Parker v. Matthews</u>, 132 S.Ct. at 2155 (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)).

Here, Petitioner does not contend the prosecutor knowingly presented perjured testimony as prohibited by <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959); he instead contends a government officer improperly gave information to the witness to influence the testimony, and the testimony was subsequently presented at trial. The Court is not aware of, and Petitioner does not cite, any clearly established federal law within the meaning of 28 U.S.C. § 2254(d)(1) that coaching a witness concerning a single factual detail pertinent primarily to a state law evidentiary issue of authentication constitutes a Constitutional violation, let alone a prejudicial denial of rights.  In the absence of any clearly established federal law on this issue, AEDPA relief is foreclosed.

Petitioner has also failed to demonstrate the commission of misconduct by either the officer who escorted the Petitioner or the prosecutor who presented the officer's testimony.  Although Petitioner argues the victim's testimony was coached, nothing in the record indicates Teso persuaded the victim to change his testimony or the victim did indeed change his testimony to suit the prosecution.  The state court reasonably determined the minor change in the victim's recollection of the date of Armando Lopez's arrival at the jail from a "week before" to "probably" ten days before the nineteenth of October does not establish coaching because the phrase "a week ago" is reasonably understood as a witness's approximation of a general time frame and need not be literally read as meaning exactly or precisely seven days.  The thrust of the victim's testimony remained the same.  The victim had access to transcripts and records to which he could have referred as a basis for a modification of his testimony.  Finally, as the state court noted, even if the victim's change in testimony could be presumed to be the result of outside "coaching," the record simply does not establish who coached him, under what circumstances, or why.

Moreover, defense counsel had ample opportunity to use the primary tools for coping with allegedly coached witnesses, namely, cross-examination and comment on the witness's credibility in closing argument.  See, <u>Geders v. United States</u>, 425 U.S. 80, 89-90

(1976); <u>United States v. Sayakhom</u>, 186 F.3d 928, 945 (9th Cir.

1999).

Finally, Petitioner has not demonstrated how any such alleged

coaching had any material effect or otherwise made his trial

fundamentally unfair. <u>Cf.</u> <u>Sayakhom</u>, 185 F.3d at 945.

In sum, the state court's decision was not contrary to, or an

unreasonable application of, clearly established federal law.

Accordingly, it will be recommended that Petitioner's coaching claim

be denied.

VII.   <u>Jurors' Oath during Voir Dire</u>

Petitioner challenges the state court's decision that the

failure during voir dire to administer the oath to the first of

three panels of jurors to be questioned was error under state law,

was forfeited by the failure of the defense to object, but was

harmless in any event.

A.   <u>The State Court's Decision</u>

The CCA's decision on this issue was as follows:

V. Failure to give voir dire oath

The defendants contend that the trial court erred when it
failed to administer the oath to prospective jurors prior
to voir dire as required by Code of Civil Procedure
section 232, subdivision (a).FN6 The record is silent
about whether the first panel of prospective jurors was
sworn before the start of voir dire on April 26, 2007. It
does affirmatively establish that on May 1 at the start of
proceedings, and after a second panel of jurors had been
called up, the court administered the oath to all
prospective jurors in the audience, and again administered
the oath when a third group of jurors was provided on May

43

2. Some of the jurors impaneled, however, were part of the
first panel and initially questioned by the court
apparently without the oath having been administered.
Assuming that the oath was not given, this was error.
However, as the California Supreme Court observed in
*People v. Carter* (2005) 36 Cal.4th 1114, 1176-1177, such
error is not structural unless there is evidence that one
or more of the jurors impaneled was biased against the
defendants, of which there is no evidence here.

> FN6. The statute provides: "(a) Prior to the
> examination of prospective trial jurors in the
> panel assigned for voir dire, the following
> perjury acknowledgement and agreement shall be
> obtained from the panel, which shall be
> acknowledged by the prospective jurors with the
> statement 'I do': [¶] 'Do you, and each of you,
> understand and agree that you will accurately
> and truthfully answer, under penalty of perjury,
> all questions propounded to you concerning your
> qualifications and competency to serve as a
> trial juror in the matter pending before this
> court; and that failure to do so may subject you
> to criminal prosecution.'" (Code Civ. Proc., §
> 232, subd. (a).)

We agree with the Attorney General that the error has been
forfeited by a failure to raise it when the error could
have been corrected. The applicable rule is well
established in California jurisprudence. An appellate
court will not consider procedural defects or erroneous
rulings that could have been but were not presented to the
trial court, particularly when the error is one that could
have been easily corrected by the trial court had it been
brought to the trial court's attention. (*People v.
Saunders* (1993) 5 Cal.4th 580, 589-590; see also *People v.
Staten* (2000) 24 Cal.4th 434, 451-452 [alleged improper
voir dire questions]; see also *Estelle v. Williams* (1976)
425 U.S. 501, 508, fn. 3 [obligation exists to call
errors, even those involving constitutional rights, to
court's attention so court will have opportunity to remedy
error].) Other jurisdictions have reached the same
conclusion. (*Gober v. State* (1981) 247 Ga. 652, 655 [278
S.E.2d 386] [court declined to reverse conviction because
voir dire was not conducted under oath where counsel
failed to object]; *State v. Glaros* (1960) 170 Ohio St. 471
[166 N.E.2d 379] [failure to administer oath to

44

prospective jurors not grounds for reversal where no
objection made in trial court]; *Wheeler v. State*
(Ala.Crim.App.2005) 939 So.2d 51, 53 [same].) This is a
perfect example of an error that could have been corrected
had it timely been brought to the trial court's attention.
Since it was not, the defendants have forfeited their
claim.

In an effort to avoid a claim that counsel rendered
ineffective representation by failing to object to the
court's alleged oversight, we also conclude that no
prejudice resulted from the failure to administer the oath
at the start of voir dire. (*People v. Carter, supra*, 36
Cal.4th at pp. 1176–1177 [failure to administer voir dire
oath reviewed for prejudice]; *Strickland v. Washington*
(1984) 466 U.S. 668, 697 [when defendant cannot establish
prejudice, unnecessary to consider whether counsel's
performance deficient].) Although there was no pretrial
questionnaire completed under oath, as was done in *People
v. Lewis* (2001) 25 Cal.4th 610, 629–930, the court did
inform the prospective jurors that "[i]f there is any fact
or any reason why any of you might be biased or prejudiced
in any way, you must disclose such reasons when you are
asked to do so. It is your duty to make this disclosure."
The court explained the purpose of voir dire and
emphasized the need to question the jurors in order to
ensure a fair and impartial jury.

There is no indication that any of the jurors who were
ultimately impaneled were untruthful when answering the
court's questions. After being sworn, the prospective
jurors were subjected to extensive and probing voir dire
by the attorneys. There is no evidence the attorneys'
questioning was inadequate to test the fairness of the
potential jurors. (See *People v. Lewis, supra*, 25 Cal.4th
at p. 631.) When the jury panel was selected, the jurors
were sworn pursuant to Code of Civil Procedure, section
232, subdivision (b).

The defendants argue that the failure of three prospective
jurors to reveal information when questioned during voir
dire suggests that all prospective jurors were unaware of
their duty to answer the voir dire questions truthfully.
We believe this evidence suggests just the opposite. All
three of these jurors came forward on their own before
trial started with additional information concerning their
ability to serve as jurors. One juror said her neighbor

45

was a probation officer who had previously told her about
the danger of criminal gangs and, although she did not
think it would bother her, she was afraid to be on the
jury. She had not mentioned before that her neighbor was a
probation officer but volunteered this information later.
A second juror came forward with a letter from a
chiropractor saying the juror would be unable to sit for
long periods due to a back condition. The juror had not
brought up the disability during voir dire. During
questioning about his disability, the juror volunteered
that he had been a motorcycle gang member for seven years.
The juror said, "I probably should have come clean about
this," suggesting he knew he was obligated to answer
questions truthfully. An alternate juror said she was
having trouble sleeping and was frightened. Although she
had mentioned before that she had been burglarized and
that she lived in a gang-infested neighborhood, she had
not mentioned her sleeping problems or her intense fear of
serving on the jury. All three were dismissed and did not
serve on the jury. These jurors took their duty seriously
and voluntarily revealed information they came to see as
relevant to their ability to serve as impartial jurors,
even though they had not revealed it earlier. There is no
evidence the defendants were prejudiced because the
initial part of voir dire was not conducted under oath.

People v. Lopez, 2009 WL 1783504 at *12-*13.

        B.   Analysis

      Respondent contends that the claim was not fairly presented to

the state courts, and thus state court remedies were not exhausted.

Respondent further contends the claim was procedurally defaulted by

the defense's failure to object to the omission, which could have

been cured.  However, the claim merits dismissal and denial for

other reasons.[3]

_____

[3]  Generally a habeas petitioner will not be afforded relief in the courts unless
he has exhausted available state judicial and administrative remedies.  Preiser v.
Rodriguez, 411 U.S. 475, 494-95 (1973).  However, a court may reach the merits of
a claim even in the absence of exhaustion where it is clear that the claim is not

46

First, to the extent the claim is one of state law error, Petitioner is attempting to raise a claim that is not subject to review, does not present a basis for relief in a proceeding pursuant to § 2254, and has previously been dismissed by the Court.

Even assuming a federal claim is raised, there is no clearly established federal law within the meaning of § 2254(a)(1) that would render objectively unreasonable the state court's decision that any error was harmless.  Petitioner does not show that failure to swear a jury at such a stage in the proceedings violated any federal constitutional right under clearly established Supreme Court law.  There is also no established Supreme Court authority for the proposition that a mistake as to swearing potential jurors raises any federal issues.  Cf. Baldwin v. State of Kansas, 129 U.S. 52, 56-57 (1889) (petitioner who alleged that the jury was improperly sworn pursuant to state statute presented no federal issue).

This is especially true here where the error, if any, affected only a few jurors in the original group, and the jury was subsequently sworn prior to trial.  The state court reviewed the

---

colorable.  28 U.S.C. § 2254(b)(2) (application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state); Granberry v. Greer, 481 U.S. 129, 134-35 (1987); Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005).
    In a habeas case, it is not necessary that the issue of procedural bar be resolved if another issue is capable of being resolved against the petitioner. Lambrix v. Singletary, 520 U.S. 518, 525 (1997).  Likewise, the procedural default issue, which may necessitate determinations concerning cause and miscarriage of justice, may be more complex than the underlying issues in the case.  In such circumstances, it may make more sense to proceed to the merits.  See Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002).

47

relevant circumstances and concluded with ample record support that there had been no showing of bias.  No circumstances suggested that any sitting juror either failed to answer honestly a material question affecting the juror's impartiality or was not otherwise capable and willing to decide the case solely on the evidence before it as is required for fundamental fairness.  See Smith v. Phillips, 455 U.S. 209, 217 (1982).  The state court also properly concluded that the fact that three jurors later during the selection process voluntarily reported additional information to the trial court demonstrated the jurors understood their obligation to tell the truth and were attempting to comply.  Petitioner admits that the three jurors who came forth with additional information were immediately excused and replaced.  The record is sufficient to permit a fairminded jurist to conclude that the essential functions of voir dire examination (exposing possible biases and other bases for challenges for cause and assisting the parties in exercising their peremptory challenges with the ultimate goal of securing a fair and impartial jury) were afforded the Petitioner.  See, McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 554 (1984) (holding in a federal products liability trial that a juror's mistaken answer regarding serious injury did not compromise the right to a fair trial).

    In sum, the state court's decision was not contrary to, or an unreasonable application of, clearly established federal law within

the meaning of § 2254(d)(1).  Further, the state court decision was not based on an unreasonable determination of fact in light of the evidence presented in the state court proceeding within the meaning of § 2254(d)(2).  No prejudicial constitutional violation occurred that would warrant habeas relief.

Accordingly, it will be recommended that Petitioner's claim concerning violation of a state statute regarding swearing of the jurors be dismissed and denied.

VIII.  Taking Verdicts and Polling the Jury

Petitioner argues that the jury was incorrectly polled in violation of two state statutes, and the verdicts were taken in an improper manner.  The CCA determined that any error had been forfeited, the polling was sufficient, and even if there had been error, it was not prejudicial because there was no evidence that the verdict was not unanimous or that there had been any coercion. (Doc. 19, 62-63.)

A.  The State Court Decision

The pertinent part of the CCA's decision was as follows:

VI. Taking verdicts and polling jurors

P. Lopez, joined by his codefendants, contends that the trial court did not properly poll the jurors in violation of sections 1149 and 1163.FN7 The Attorney General counters that the issue has been forfeited because there was no objection when the verdicts were taken.

FN7. The sections read: "When a verdict is rendered, and before it is recorded, the jury may be polled, at the request of either party,

49

in which case they must be severally asked
whether it is their verdict, and if any one
answer in the negative, the jury must be sent
out for further deliberation." (§ 1163.) "When
the jury appear they must be asked by the Court,
or Clerk, whether they have agreed upon their
verdict, and if the foreman answers in the
affirmative, they must, on being required,
declare the same." (§ 1149.)

We agree that the issue has been forfeited. The trial
court asked the foreperson if a verdict had been reached
and, when given an affirmative answer, had the court clerk
read the verdicts of all three defendants. At the end, the
clerk asked the jury as to each of the defendants, "is
this your verdict, so say you one, so say you all?" The
jury responded with a unanimous affirmation of the
verdicts for each individual defendant. The defendants
then requested that the jury be polled. The clerk asked
each individual juror, as to each defendant, whether this
was or is "your verdict." As to all three defendants, all
12 jurors answered, "yes." No counsel made any objection
to the manner in which the verdicts were taken. "Where a
jury is incompletely polled and no request is made for
correcting the error, such further polling may be deemed
waived by defendant, who cannot sit idly by and then claim
error on appeal when the inadvertence could have readily
been corrected upon his merely directing the attention of
the court thereto." (*People v. Lessard* (1962) 58 Cal.2d
447, 452; *accord, People v. Wright* (1990) 52 Cal.3d 367,
415; *People v. Flynn* (1963) 217 Cal.App.2d 289, 295 [right
to assert defects in manner of polling is forfeited by
failure to object to method employed by trial court].)

Even if the issue has not been forfeited, we conclude
there was no error in the taking of the verdicts. Each
juror was asked individually if the verdicts read by the
court clerk were their individual verdicts and each
answered in the affirmative. This is sufficient. (*People
v. Mestas* (1967) 253 Cal.App.2d 780, 786.) The different
verb tense used by the court clerk in taking the verdicts
is of no significance. Further, even if there was error,
there is no prejudice. "[T]he trial court's failure to ask
each juror if the verdict was his or her [own] requires
reversal only if appellant were prejudiced by that error."
(*People v. Masajo* (1996) 41 Cal.App.4th 1335, 1340.) There
is nothing in this record to suggest that the verdict was

50

not unanimous or that any juror was coerced into voting
for conviction.

People v. Lopez, 2009 WL 1783504 at *14.

    B.  Analysis

    Here, because the state court addressed the issue of prejudice,
the Court will bypass defects raised by Respondent with respect to
exhaustion and procedural default.  Petitioner has failed to state
facts entitling him to relief on the merits in this proceeding.
Thus, reference is made to a recent summary of the status of the law
set forth in this Court's decision in Lopez v. Lopez, no. 1:11-cv-
00121-JLT-HC,  2013 WL 5302592, *23-*24 (E.D.Cal., Sept. 19, 2013
(unpublished), concerning Petitioner's co-defendant, as follows:

    Respondent once again argues that Petitioner's claim is
    unexhausted, thereby precluding review. Again, the Court
    agrees. However, notwithstanding the lack of exhaustion,
    the claim fails to state a federal habeas claim because no
    federal constitutional right is involved. The right to
    poll the jury, though one of long-standing in federal and
    most state courts, see Virgin Islands v. Hercules, 875
    F.2d 414, 417 (3d Cir.1989), is not, however, a binding
    constitutional right. Id.; see United States v. Sturman,
    49 F.3d 1275, 1282 (7th Cir.1995) (right to poll jury is
    not of constitutional dimension); United States v. Carter,
    772 F.2d 66, 67 (4th Cir.1985) (same); United States v.
    Beldin, 737 F.2d 450, 455 (5th Cir.) (same); Jaca
    Hernandez v. Delgado, 375 F.2d 584, 585-86 (1st Cir.1967)
    (same). In federal court, the right to poll the jury
    instead derives from Federal Rule of Criminal Procedure
    31(d), which allows a poll of the jury at the request of
    any party or upon the court's own motion. Hercules, 875
    F.2d at 418; Beldin, 737 F.2d at 455. But federal criminal
    procedural rules, such as Rule 31(d), "do not apply to
    state court proceedings ." Boardman v. Estelle, 957 F.2d
    1523, 1525 (9th Cir.1992). Thus, Petitioner's state trial
    court was only bound by, and therefore could have violated
    only, state law, i.e., California Penal Code § 1163, which
    requires the court to poll the jurors individually at the
    request of either party. The denial of a state-created
    procedural right such as this may present a cognizable due

51

1

2

3

4

5

6

7

> process claim on federal habeas corpus review only if it
> resulted in a "deprivation of a substantive right
> protected by the Constitution." <u>Bonin v. Calderon</u>, 59 F.3d
> 815, 842 (9th Cir.1995). Petitioner does not present such
> a claim here because, as discussed above, the right to
> poll the jury is not one protected by the Constitution.
> Violations of state law are not a basis for federal habeas
> corpus relief. <u>Estelle v. McGuire</u>, 502 U.S. at 67-68.
> Accordingly, Petitioner's claim, even if exhausted, would
> fail to state a cognizable federal habeas claim for which
> this Court could grant relief.

8

9

> Because Petitioner has not established any grounds for
> habeas relief, the Court will, accordingly, deny the
> petition for writ of habeas corpus with prejudice.

10

<u>Lopez v. Lopez</u>, no. 1:11-cv-00121-JLT-HC, 2013 WL 5302592, *23-*24

11

12

(E.D.Cal., Sept. 19, 2013 (unpublished).  No Supreme Court authority

recognizes polling provided for by state statute as a substantive or

13

free-standing constitutional right.  <u>Saldana v. McDonald</u>, no. 1:10-

14

15

cv-01747-JLT-HC, 2013 WL 1626567, *17-*19 (E.D.Cal. April 15, 2013)

(unpublished); <u>Moore v. Hedgpeth</u>, no. C-09-1634 RS (PR), 2012 WL

16

17

1745542, *10 (N.D.Cal. May 16, 2012) (unpublished); <u>Hodge v.</u>

<u>Scribner</u>, no. ED CV 09-01025-JHN (VBK), 2010 WL 457614, *12

18

(C.D.Cal. Feb. 2, 2010) (unpublished).

19

20

Insofar as Petitioner's claim might be premised more generally

on the right to a fair trial, the record does not reflect coercive

21

influences on the jury, lack of unanimity as to the verdicts, or any

22

other factor that would suggest that the polling procedure

23

diminished Petitioner's trial rights or resulted in any unfairness

24

with respect to the result.  Petitioner has not shown that the

25

26

polling procedure resulted in actual prejudice.  <u>Brecht v.</u>

<u>Abrahamson</u>, 507 U.S. at 637.

27

28

Accordingly, it will be recommended that Petitioner's claim

concerning polling of the jury be denied.

1    IX.   Evidentiary Hearing

2        Petitioner requests that an evidentiary hearing be held if

3    additional facts are needed for review of his claims.  (Doc. 19,

4    14.)

5        The decision to grant an evidentiary hearing is generally a

6    matter left to the sound discretion of the district courts.  28

7    U.S.C. § 2254; Habeas Rule 8(a); Schriro v. Landrigan, 550 U.S. 465,

8    473 (2007).  To obtain an evidentiary hearing in federal court under

9    the AEDPA, a petitioner must allege a colorable claim by alleging

10   disputed facts which, if proved, would entitle him to relief.

11   Schriro v. Landrigan, 550 U.S. at 474.  The determination of

12   entitlement to relief is limited by 28 U.S.C. § 2254(d)(1) and (2)

13   which require that to obtain relief with respect to a claim

14   adjudicated on the merits in state court, the adjudication must

15   result in a decision that was either contrary to, or an unreasonable

16   application of, clearly established federal law, or was based on an

17   unreasonable determination of facts based on the evidence before the

18   state court.  Schriro v. Landrigan, 550 U.S. at 474; Earp v.

19   Ornoski, 431 F.3d 1158, 1166-67 (9th Cir. 2005).  In analyzing a

20   claim pursuant to § 2254(d)(1), a federal court is limited to the

21   record that was before the state court that adjudicated the claim on

22   the merits.  Cullen v. Pinholster, 131 S.Ct. at 1398.

23       Here, with respect to claims adjudicated in state court,

24   Petitioner has not shown entitlement to relief under § 2254(d).

25   Thus, the Court is not required to hold an evidentiary hearing.

26   Cullen v. Pinholster, 131 S.Ct. at 1399 (citing Schriro v.

27   Landrigan, 550 U.S. 465, 474 (2007)).  To the extent any of

28   Petitioner's claims were not adjudicated in state court, Petitioner

53

1    has failed to show that he suffered any legally sufficient prejudice

2    that would warrant habeas relief.  An evidentiary hearing is not

3    required where the state court record resolves the issues, refutes

4    the application's factual allegations, or otherwise precludes habeas

5    relief.  Schriro v. Landrigan, 550 U.S. at 474.  No evidentiary

6    hearing is required for claims based on conclusory allegations.

7    Campbell v. Wood, 18 F.3d 662, 679 (9th Cir. 1994).  An evidentiary

8    hearing is also not required if the claim presents a purely legal

9    question, there are no disputed facts, or the state court has

10   reliably found the relevant facts.  Beardslee v. Woodford, 358 F.3d

11   560, 585-86 (9th Cir. 2004); Hendricks v. Vasquez, 974 F.2d 1099,

12   1103 (9th Cir. 1992).  Thus, an evidentiary hearing is not required.

13        In sum, it will be recommended that Petitioner's motion for an

14   evidentiary hearing be denied.

15        X.  Matters First Raised in the Traverse

16        Petitioner appears to argue for the first time in the traverse

17   that the gang evidence, including the huila, was prejudicial

18   character evidence of prior bad acts.  (Doc. 45, 14.)

19        It is improper to raise substantively new issues or claims in a

20   traverse, and a court may decline to consider such matters.  To

21   raise new issues, a petitioner must obtain leave to file an amended

22   petition or additional statement of grounds.  Cacoperdo v.

23   Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994), cert. den., 514 U.S.

24   1026 (1995).

25        Generally, a habeas petitioner will not be afforded relief in

26   the courts unless he has exhausted available state judicial and

27   administrative remedies.  Preiser v. Rodriguez, 411 U.S. 475, 494-95

28   (1973).  A petitioner can satisfy the exhaustion requirement by

providing the highest state court with the necessary jurisdiction a full and fair opportunity to consider each claim before presenting it to the federal court, and demonstrating that no state remedy remains available.  Picard v. Connor, 404 U.S. 270, 275-76 (1971); Johnson v. Zenon, 88 F.3d 828, 829 (9th Cir. 1996).

Here, there is no allegation or showing that Petitioner raised this issue in state court or otherwise presented it in a timely and orderly manner, and there is no showing of any excuse or justification for Petitioner's failure to do so.  Accordingly, the Court should decline to consider Petitioner's character evidence claim.

XI.  Certificate of Appealability

Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the Court of Appeals from the final order in a habeas proceeding in which the detention complained of arises out of process issued by a state court.  28 U.S.C. § 2253(c)(1)(A); Miller-El v. Cockrell, 537 U.S. 322, 336 (2003).  A district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Rule 11(a) of the Rules Governing Section 2254 Cases.

A certificate of appealability may issue only if the applicant makes a substantial showing of the denial of a constitutional right. § 2253(c)(2).  Under this standard, a petitioner must show that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.  Miller-El v. Cockrell, 537 U.S. at 336 (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)).  A certificate should issue if the Petitioner

shows that jurists of reason would find it debatable whether: (1) the petition states a valid claim of the denial of a constitutional right, and (2) the district court was correct in any procedural ruling.  Slack v. McDaniel, 529 U.S. 473, 483-84 (2000).

In determining this issue, a court conducts an overview of the claims in the habeas petition, generally assesses their merits, and determines whether the resolution was debatable among jurists of reason or wrong.  Id.  An applicant must show more than an absence of frivolity or the existence of mere good faith; however, the applicant need not show that the appeal will succeed.  Miller-El v. Cockrell, 537 U.S. at 338.

Here, it does not appear that reasonable jurists could debate whether the petition should have been resolved in a different manner.  Petitioner has not made a substantial showing of the denial of a constitutional right.  Accordingly, it will be recommended that the Court decline to issue a certificate of appealability.

XII.  Recommendations

In accordance with the foregoing analysis, it is RECOMMENDED that:

1) Insofar as Petitioner raises state law claims, the petition for writ of habeas corpus be DISMISSED;

2)  The remainder of the first amended petition for writ of habeas corpus be DENIED;

3)  Judgment be ENTERED for Respondent;

4)  Petitioner's motion for an evidentiary hearing be DENIED; and

5) The Court DECLINE to issue a certificate of appealability.

These findings and recommendations are submitted to the United

States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be served and filed within fourteen (14) days (plus three (3) days if served by mail) after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, - F.3d -, -, no. 11-17911, 2014 WL 6435497, *3 (9th Cir. Nov. 18, 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **December 10, 2014**                     **/s/ Sheila K. Oberto**
                                        UNITED STATES MAGISTRATE JUDGE